May it please the court, I'm Jeff Rosenzweig from Little Rock and I represent Alvin Jackson and actually have done so for the past 20 years. There are several things that are not in dispute. One is that Alvin Jackson has a bad brain. Another thing that's not in dispute is that that fact has been evident since his early childhood. There's no dispute that he is either intellectually disabled or mentally retarded, whatever term you want to use, or very close to it. He was found to have been mildly mentally retarded as a child. Our expert, Dr. Moneypenny, says he's clearly retarded. The results obtained by Dr. McBaw, the state's expert, says he's retarded as well. Dr. McBaw did not necessarily believe those results because he surmised that Mr. Jackson may have been malingering. The problem with that is, as Dr. McBaw conceded, it is difficult to determine when an actual retarded person or intellectually disabled person is trying to malinger. But the district court has convinced itself that Mr. Jackson is not intellectually disabled, is not retarded. But in doing so, the court made several very salient errors. One is... These legal errors or factual errors? Well, they're legal errors, but we submit that it also spilled over into the factual analysis. And I'll give you the two most salient errors. One is to require a nexus between the intellectual disability or retardation and the offense. That was... The court went on for pages and pages about how the... The Colclasure homicide and then the Grimes homicide showed some planning and this and that and quoted the Scalia dissent, not the majority opinion, as to how that really didn't make... This wasn't the type of thing that Atkins was intended for. The problem there is the U.S. Supreme Court in Tenard v. Drechty specifically said there is no such requirement under Atkins for such a nexus. And that was clearly... Clearly, we submit part of Judge Wright's analysis that there had to be such a connection. And even though it was undisputed from Dr. McLaugh that he had all sorts of adaptive behavior deficits dating from childhood and, of course, the other problem there in terms of adaptive behavior is that he has been in prison essentially since the age of 18 and actually was incarcerated as a juvenile sometimes before then. And, of course, as was conceded, there's a huge problem in attempting to determine adaptive behavior while one is in prison, particularly when one is in the very close confines of death row. Another... I thought that was kind of an interesting facet of this case is how you determine what someone's adaptive or abilities are when they're in such a regimented environment, which a psychologist conceded is a big problem. They seem to use as, I don't want to say a proxy for that, but his pleadings and his writings. What do you make of that? Now, I know some of that was explained that he didn't actually write it, but they seem to feel that, well, his vocabulary, his ability to understand concepts, this idea of... What's the term? You send the letter out with the wrong return mail address, so that's how you get mail to other prisoners. There's a name for that, and I can't think of it now. It shows a level of sophistication and mental acuity that is not consistent with mental retardation. Well, he has a good ability to parrot, not to do original thinking, and that's part of it. I mean, their pleadings get passed around. I want to point out another thing. The quotations in the district court opinion make him sound fairly eloquent. That's not the way... And Judge Wright did concede that he stutters. In fact, he stutters so much that it's almost impossible to understand him, actually, and it takes a real effort by the stenographer to put it down in an actual sentence with a subject verb, et cetera. And again, this was... But this is a problem when the guards do everything for you or when one is settled next to someone else and someone else is telling you this is what you can do. That's why we presented or attempted to present two inmates who had done legal work for Mr. Jackson, one of whom, of course, decided he wanted his own case taken care of first, and that was, of course, the end of his cooperation there. Anyway, that's... I'm not sure if I understand the point you were making a few minutes ago that you say you think Judge Wright improperly used evidence about the facts of this crime and other crimes to influence her decision on the intellectual ability. Yes, sir. How do you... Why do you say that? What part of her opinion would we look to see where she did that? And the reason I ask the question, when I look at her findings on page 43, it seems to be couched in terms of a comparison between Dr. McVaugh and Dr. Moneypenny and crediting Dr. McVaugh and giving her reasons for that, and I don't see reference to the facts of the crimes in that part of the opinion. Well, it did affect certainly the adaptive behavior, and I... Excuse me. I'm sorry. My position is that it did... is that the court's mistakes in requiring something that, for instance, is not authorized by Tenard would have affected the court's analysis of the intellectual disability. Yes, of course, I understand, as I said in my brief, the problem we have in overcoming a fact finding. I understand that, and that's... This is the way we overcome it. There's no question that both experts, McVaugh and Moneypenny, got results that have them in prong one, the significantly sub-average. Now, Moneypenny says, my results are correct. McVaugh says, no, I don't think they're correct because I think he's malingering, but he conceded that we've got the problem with judging malingering. And we do know, and everyone agrees, that he has a bad brain. We've got all sorts of results that are within the range to be considered from childhood when he is... before he ever murdered anyone. So we've got that issue. And, of course, the second issue is the fact on requiring the linkage between the significantly sub-average and the adaptive problems. Does the Supreme Court's Moore case help us at all? Yes, sir. I believe, although it's obviously not the same facts, but what Moore does, it says, you look to the medical, the psychological, the psychiatric, and not the lay opinion as to something. Or he doesn't sound retarded, or he acted in such a way that a lay person, a retarded person wouldn't do that. And I believe that the district court's opinion fell into, to some extent, the sort of trap that Moore says you're not supposed to do. But it was very clear that at the time of the hearing, and this was very evident in the McVaugh examination, the cross-examination, that there was no, at the time, no requirement of a linkage between prong one and prong two. But between the time we heard the case and the time Judge Wright decided it, DSM-5, which does require a linkage that DSM-4 did not, and she ruled against this under DSM-5. But it was very... Why isn't it the appropriate thing to do to, under current Supreme Court president, to use the most recent medical, psychological manual for the legal analysis? It seems that's what the court recommends that the decision-makers do, is to use the most recent, as opposed to what may have been around at the time of the crime or some earlier period. It would be if that was the format in which the case had been litigated, but it was not. I mean, at the time... Would it be appropriate for us to remand for review under DSM-5 facts in terms of giving the sides the opportunity to make their case? Yes, sir, it would be. And that we could call the experts again and go into it with regard to the DSM-5 criteria. How were you specifically prejudiced by using the DSM-5 versus DSM-4? Because, Judge, because the district court specifically said we had failed to provide, show a linkage between prong one and prong two. When, in fact, that was not required. It was simply not required at the time, and Dr. McBall specifically conceded. We don't... You know, that's a matter of some controversy in the field. DSM-5 purported to resolve the controversy... purported to resolve the controversy in a way that would hurt us, and it clearly did hurt us, because it was part of Judge Wright's ruling against us. So would a remand then require essentially a complete redoing of what's been done with these witnesses coming back and a different examination, new evidence? Well, I don't think it would necessarily require that. I mean, you're required... You're going to need to determine the context. I mean, I think the experts would have to be the ones... have to be the ones to answer that, although this wouldn't be under... Obviously, it's not going to be writing under a blank slate. I mean, there's no question about that. It's not going to be a blank slate, but it may involve having both experts examine Mr. Jackson again. They wouldn't be examining under a blank slate and ask, what is your opinion? And then the judge, Judge Wright, can make her decision. But it is, again, it is our position that for these reasons, that would have, in addition to the legal errors, that would have had the effect of eschewing the fact findings and a remand, in fact, a reversal and a remand would be appropriate. And I'll reserve the rest of my time for rebuttal if there are no further questions. Thank you, Mr. Rosenzweig. Ms. Rumps? Good morning. May it please the Court, I am Pamela Rumps and I represent the Applee-Wendy Kelly. I'm going to start where we ended off, and that's regarding the linkage requirement in the DSM-5, which the district court specifically used in its opinion, denying Mr. Alvin Jackson relief in this case. To begin with, the district court did not make a finding that Mr. Jackson was or was not mentally retarded. The district court's opinion was that Mr. Jackson had not proven that he was mentally retarded. And as this court is aware, it is Mr. Jackson's burden, by a preponderance of the evidence, to establish the requirements of mental retardation, that being that he has significant general, sub-average, general intellectual functioning and that he has concurrent adaptive deficits. The link in this case, the DSM-5 link in this case, Judge Smith, you're exactly right. Moore v. Texas says you used the latest science, and that makes sense. Would it make sense for practitioners, in general practitioners, to be using new science while the courts are using old science? And Moore recognizes that. Moore says that the decisions of courts in Atkins hearing needs to be informed by the new science. This is not a surprise. In Atkins, he was sentenced to death in 1998, but when the court decided the Atkins case in 2001, it used the newest version of the DSM. In this case, I seem to understand the appellant's argument to be that the preparation for the hearing and the hearing itself was done with an expectation that DSM-4 was the relevant standard, but then the decision comes out using DSM-5. Well, I'm not sure that that's the case. And as this court recognized in Sasser that... Well, let me back up. Mr. Jackson knew that there was a potential change in the wind. He cross-examined Dr. McFaul about it. And so it wasn't a surprise that this change was coming. And second of all, the question about whether the DSM and the linkage in this case is really a moot question because Mr. Jackson simply didn't establish either prong of mental retardation. He didn't establish that he had significant, sub-average general intellectual functioning. The court specifically credited the testimony of Dr. McFaul in that regard. Mr. Jackson also didn't establish that he had adaptive deficits. And in fact, the court gave no weight to Dr. Moneypenny and his administration of the ABAS to Mr. Jackson's brother, Calvin. So whether there was a requirement of linkage or no linkage is really moot in this case because neither prong was established by a preponderance of the evidence to the district court's satisfaction. Can I ask a question about the timing on this DSM-4 versus DSM-5 issue? If I'm understanding correctly, DSM-5 came out in 2013. Is that right? Yes. And the hearing wasn't until 2016? The hearing in this case was in 2011. But the order wasn't until 2016? The order wasn't until 2016. That's right, I was getting confused. So the hearing was conducted under DSM-4, but the argument is there was a... So it took five years for the district court to get the order out? Four years. Four years. So during that four-year interval is when the DSM-5 comes out, and the argument is, well, we presented our evidence under DSM-4, she decides it under DSM-5, which wasn't even in existence at the time of the hearing. So it isn't even preparation for the hearing, it's the actual hearing itself, right? Yes. And I think that Mr. Jackson's argument would have more weight if he had established either prong at the hearing, but he didn't establish either prong. And what he's asking for is not a chance to go back and establish linkage, he's asking for a chance to go back and establish what he did not establish to the district court's satisfaction over the course of a two-day hearing. He was able to present the expert of his own choosing, he was able to present all the witnesses he wanted, including his brother, and the district court simply found that he had failed to meet the standard under the Arkansas statute. The relevant cases that we have from the Supreme Court seem to put quite a bit of weight on the mental evaluations in terms of IQ scores being in a certain range, and if they're there, then the defendant's gone a long way to establishing an intellectual disability. And in this case, those numbers are in that range where it seems that he's at least put a credible case out that he's got intellectual disability. I disagree. Okay, explain. And let me explain to you why I disagree. Yes, Dr. McVaugh, the state's expert, testified that there are problems with testing for malingering in cases of mental retardation, but Dr. McVaugh also testified that it's something that had to be done and that it is the number one rule-out to determine whether someone is putting forth their best effort, including in a case like this where the tester, the person being tested, his very life depends on the outcome of these scores. Did the district court make a definitive finding of malingering? The district court credited Dr. McVaugh's testimony that Mr. Jackson had malingered during his testing, and it found that Dr. McVaugh's testing, Dr. Moneypenny's testing, and testing conducted on Mr. Jackson in conjunction with the Cole-Klaser murder trial in 1990, quote, were not reliable evidence of intellectual functioning, unquote. And so when you take those scores out of the mix and you look at his older scores, which are on page 906 of the Joint Appendix, there are numerous problems with those older scores, too. But nevertheless, the district court recognized that in Hall v. Florida, the Supreme Court said if you have tests which, with the standard error of measurement, take you to that 70 cutoff point or below, you're entitled to put on evidence of adaptive functioning. That's all Hall says, and that's what Mr. Jackson got. He got a chance to put his scores on. The district court noted that these prior scores, though above 70, didn't preclude a finding of mental retardation, and it went ahead and let him put his adaptive deficit evidence on, which the district court gave no weight to. The prior testing, however, conducted from the time Mr. Jackson was 7 years old right before he was incarcerated for the Cole-Klaser murder, as Dr. McVaugh testified, there's numerous problems with this old data. And he couldn't say that this old data was reliable. He had no raw data to double-check the scores and make sure the scores were accurate. He had no reports, except for in one instance, to even verify what version of the test was given and whether a licensed psychologist had given the test. In some cases, he didn't know what version of the test had been given. And so, well, and in three cases, in the 1982, 1988, and 1989 tests, Dr. McVaugh said in his report, those tests which were given to Mr. Jackson at that time cannot be used to diagnose mental retardation. So three of the prior tests were invalid for a diagnosis of mental retardation. And when you look at the prior scores, they were fraught with the error that Dr. McVaugh testified to. But even if you look at those scores, the district court let him put on his adaptive functioning evidence because that's what Hall requires, and found at the end that the scores didn't establish general significant subaverage functioning or that his adaptive deficit evidence was unpersuasive. She gave it no weight. The argument that the old scores aren't valid to determine mental retardation sort of sounds a little bit like a Catch-22 because, as I understand, under both the DSM-IV and V, IV specifically says it has to be shown to start before age 18, and I think V says it's more general during the developmental period. So if a person comes in in order to meet that prong, the third prong, if you want to call it that, and says, I have IQ scores and testing from grade school that show I was mentally retarded, then the response is, well, yeah, but they're so old that you can't rely on them. But you have to show something that's old to get past. If they didn't have the scores, you'd be in here arguing, well, he has no evidence that this occurred before age 18. Let me think about that. The problem is that it's Mr. Jackson's burden. That's what Atkins says. And if he comes in with evidence that cannot be trusted and that cannot be credited, that doesn't fall on the state. And these scores, we don't know what Dr. Moneypenny did to validate these scores. We don't know whether there were reports out there. We don't know whether there was raw data out there. We don't know whether there was ways to discover who administered the test or whether there were ways to discover what tests were given. We just know that Mr. Jackson didn't present that evidence. And our experts said that's a problem and that the failure to be able to validly give these scores credit through the raw data, through the knowledge that a licensed psychologist administered it, through even a report that I can read to see what version of the test was given, is a failure of Mr. Jackson. And all of these scores were locally obtained. Mr. Jackson was born and raised in Little Rock. The crimes occurred in Little Rock and Jefferson County. And so it's not the state's burden to make these scores valid. It's the state's responsibility to point out that he has a burden and this court ordered an evidentiary hearing on his Atkins claim and the district court gave him his hearing. If he didn't reach his burden after a two-day hearing, unlimited hearing, where he was allowed to present what he needed or wanted to present, that simply can't be the fault of the state. Counsel, on page 17 of the district court opinion, there is the statement that Dr. McVall testified that he is unable to state a forensic opinion to a reasonable degree of certainty as to whether Jackson is intellectually disabled as defined under Atkins and Arkansas law. And there's a little bit of a discussion about that. If we looked at the transcript of this hearing, how did Dr. McVall flesh that out? What does that mean? What point was he making by that testimony? Both experts agree, Dr. Moneypenny and Dr. McVall, agree that a clinical versus forensic opinion rested on the quantum of proof and that a clinical opinion requires less proof than a forensic opinion. And Dr. McVall said that was because in a clinical setting, the standards aren't as rigorous. In a forensic setting, he said, the expert is attempting to try to help the fact finder with a psycholegal issue, and so the standards are more rigorous. He wasn't comfortable, given the invalid data and the problem with the data in this case, making a forensic opinion. But clinically, Dr. McVall was of the opinion that he wasn't mentally retarded and that Mr. Jackson was at least mid-borderline. So he's saying that when he's talking about a forensic opinion, he's saying he's not comfortable suggesting to the court what decision the judge should make on this Atkins and Arkansas law question of intellectual disability. Yes. That was for the court, and with more evidence, he might have been able to better assist the court forensically, but because of, as he put it, the threats to the data, he couldn't do it. But again, I'd like to... And this question of intellectual disability or retardation, that's under Atkins and under the Arkansas law, these prongs or factors, that is for the court to decide. It's not strictly a medical or a psychologist, the realm of the psychologist opinion, correct? Exactly. And in fact, Moore v. Texas says that the mental retardation analysis or decision is for the court, although it is informed by the medical community and the psychological community. And it noted that the court's decision is, quote, Before I wrap up, if the court doesn't mind, I would like to address a few points made by Mr. Rosenzweig where I think that perhaps we disagree. He cited Tenard v.... Well, the Tenard case, and he used the Tenard case for a prohibition about linking mental retardation with the facts of the crime. Well, that's not what the court did here. The court linked the general subaverage functioning with the adaptive deficits, which is what the DSM-5 permits and indeed requires. I'm not sure. The Tenard case simply said that you can't link, you can't find a person non-mentally retarded based solely on the facts of the crime. You have to look past that. That's not what the district court did here. So I'm not positive that we agree on the application of the Tenard case. Do some at least discussion of those facts and pointing out the planning and the reasoning process that went into particular the cold-closure murder and then as well kind of the ambush at the prison? Yes, the court did in fact do that, and that's proper. What's not proper under Tenard is to make a finding on either prong of the mental retardation test, the intellectual prong or the deficit prong, based solely upon that conduct. And that was the problem in Tenard. And here we don't have that. The court looked at the testimony of all the experts. It looked at the prior scores. It looked at the ABAS administered to Mr. Jackson's brother Calvin, and it considered the facts of Mr. Jackson's crime, which the state submits as proper under Brunfield v. Cain, to come up at a conclusion that Mr. Jackson simply hadn't met his burden. By doing that, it didn't graft or engraft an additional requirement for Mr. Jackson to prove. What it did was exactly what the law contemplates. It looked at everything. It let the science inform it, and it made a decision. But nevertheless, the court had already found, by the time it talked about the facts of Mr. Jackson's crimes, the court had already found that Mr. Jackson had not proven either prong of the mental retardation test before it even went into this discussion about the maladaptive traits that were mentioned by the court in Atkins. And so whatever it said at that point, the conclusion had already been made that Mr. Jackson simply had failed in his burden to establish either prong of the mental retardation definition as required under Arkansas law, which, of course, is the standard we use under Atkins. And so while that's interesting and while it's, I think, helpful, because as Dr. McVaugh testified, more data, less error. And so you do look at as much stuff as you can. That's why Dr. McVaugh literally looked at thousands and thousands and thousands and thousands of pieces of paper. That's why he talked to correctional officers. That's why he read both trial transcripts, which is something Dr. Moneypenny didn't do when he issued a three-page report in this case compared to Dr. McVaugh's 61-page report. And so the court was only doing what the case law envisions, and that is making a clean, clear picture using the science, using the scores, using the evidence of adaptive deficits to conclude that Mr. Jackson had failed in his burden. Unless there's any questions, we rest on our brief and ask the court to affirm the decision of the district court. All right. Thank you, Ms. Rompstad. Thank you. No additional questions. Mr. Rosenzweig, your rebuttal. I just want to point out a couple of things. First, there was also, and it's in the record in the joint appendix, there was the testimony of the experts, the people who administered the test, who had examined Mr. Jackson as a child. Their testimony, which was in the co-closure penalty phase, is in the record, and they clearly testified to those childhood things at the time and, of course, were subject to cross-examination. That was the case in which the state sought but did not obtain the death penalty. That was the homicide that Mr. Jackson committed, the co-closure homicide. I'll also point out, too, that even Dr. McVaugh said, if he's retarded, it's not by much, and if he's not retarded, it's not by much, that this is on the knife's edge. It's a very close case. And on the issue of the development before the age of 18, Dr. McVaugh said, and this is at page, the hearing 283, the appendix of 342, and I quote it in here, my question, and there's no dispute here that whatever he had, whatever Mr. Jackson has, has its onset before age of 18. Answer, correct. Question, so this is not an adulthood phenomenon here for Mr. Jackson. Answer, it is not. I mean, there's no question that these events occurred before the age of 18, that his problems occurred before the age of 18, and it would be clearly erroneous to hold that it was not done before the age of 18 when everyone, not only the contemporaneous records, but the testimony at a trial when Mr. Jackson was 18 or 19, talking about things that had happened just a few years earlier, plus even Dr. McVaugh says that it is a childhood, that this was a childhood phenomenon. And the sheer weight of it, fortunately for Mr. Jackson, of course, he lived in Little Rock, so he got caught by the Little Rock School District, which had the resources to handle him, and not something that would have necessarily happened in a rural area, but he was in the system for a long time. Anyway, and if I'm hearing Ms. Rumps correctly, she's looking at Tanard differently from how clearly Judge Wright looked at it, which is Tanard says there is not, that the retardation, the intellectual disability does not have to have a nexus to the offense. And I would submit that the only way to read the district court's ruling is that it, and she found that there wasn't a nexus because of the alleged planning, and of course the problem there is, and of course the case is also recognized, that one can have strengths in certain areas and that doesn't affect the fact that you have the deficit in the other area because the condition affects the whole spectrum of one's life. So I would request respectfully that the court reverse and remand back to the district court for further consideration. Thank you. Thank you, Mr. Rosenzweig. Thank you also, Ms. Rumps. We appreciate both counsel's presence this morning and the arguments you've provided to the court. And the briefing you've submitted will take the case under advisement. Madam Clerk, would you call case number two for the morning?